199 So.2d 109 (1967)
COMMERCIAL TRADING COMPANY, Inc., a New York Corporation, Appellant,
v.
ZERO FOOD STORAGE, INC., a Florida Corporation, Appellee.
No. 66-523.
District Court of Appeal of Florida. Third District.
May 23, 1967.
Rehearing Denied June 20, 1967.
*110 Feibelman, Friedman, Hyman & Britton, Miami, for appellant.
Knight, Underwood, Peters, Hoeveler & Pickle and J.T. Blackard, Miami, for appellee.
Before PEARSON, CHARLES CARROLL and BARKDULL, JJ.
PER CURIAM.
The plaintiff appeals a summary final judgment in an action where it claimed damage for the release of stored meat. The complaint alleged that the plaintiff was the assignee of a bill of lading and that it demanded delivery of the items described in the bill of lading but the defendant failed to deliver the meat to the plaintiff. Summary final judgment was entered by the trial court upon the pleadings, depositions, and affidavits on file.
A shipment of beef was transported from Guatemala to Miami by Coordinated Transport, Inc. The beef was shipped under a non-negotiable bill of lading[1] which designated Progressive Meat Packers as the "notify party" and Trade Bank and Trust Company, New York as the consignee. The meat was shipped in a refrigerated trailer designated as #510 on the bill of lading. The bill of lading was subsequently assigned to Commercial Trading Company.
Mr. H. Reeder, a customs broker who normally represented the "Notify party", *111 Progressive Meat, was informed of the pending arrival of the goods in question. The meat arrived in Miami and pursuant to normal procedure when freight charges and customs fees have not been paid, the beef was placed in Zero Food Storage Warehouse under Coordinated's customs bond. The goods were to be held in the name of Coordinated for the account of the "notify party."
Thereafter, Commercial Trading, the assignee of the bill of lading, contacted Zero by letter concerning the shipment of beef. Zero had already released the goods to the designees of the notify party. In response to Commercial's inquiry concerning the whereabouts of the beef, Zero answered with a letter which is important enough to include in full.
 "Commercial Trading Company, Inc.
 1440 Broadway
 New York, New York
Dear Mr. Grossman:
Upon receipt of a signed copy of this letter we will forward to you the amount of monies as herein indicated due your company.

 439 Boxes of meat at $21.75/box $9,548.25
 Less Zero Food Storage charges 2,313.64
 Balance due Commercial Trading 7,234.61

Due to the nature of this account a signed copy of this letter is our authority to deduct our above indicated storage charges and relieves us of any further liability or responsibility in connection with your account of Progressive Meat Packers, Inc. account.
In answer to your inquiring of Trailer 510, at the present time we are not holding any such trailer or product at all in the name of Coordinated Carribbean Transport, Inc., or Commercial Trading Co., Inc. or Progressive Meat Packers, Inc. Attached please find a copy of letter to Mr. Descalzo of C.C.T.
 Yours very truly
 ZERO FOOD STORAGE, INC.,
 For Commercial Trading Co., Inc.
 Carl C. Grossman"
Commercial's vice-president, signed the letter which authorized deduction of the charges specified in the above letter. It is important to note that Zero had dealt with Commercial in other transactions involving the storage of beef. The $2,313.64 storage charge referred to in the letter concerned another transaction under similar circumstances.
There is conflicting evidence concerning whether or not the carrier (Coordinated), who had deposited the goods, ever gave the warehouseman (Zero) permission to release such.[2] Zero contends that it received permission over the telephone from an employee of Coordinated. Coordinated alleges that no oral permission was ever given and that it is not the practice of the carrier *112 to give permission by phone. Coordinated's operation manager further stated that permission to release is not given until freight and custom charges are paid and not until the carrier has in its possession the original documents.
The defendant, Zero, moved for a summary judgment which was granted by the court and a final judgment entered in favor of Zero. This appeal stems from the entry of the summary final judgment.
Appellee, Zero, contends that the summary judgment was correct since it received no notice of the assignment of the bill of lading from Trade Bank to Commercial. Appellee also contends that the letter from Zero to Commercial constitutes a release from liability and is a sufficient ground on which to sustain the decision of the trial court.
If a warehouseman delivers the goods to one who is not lawfully entitled to them, he is liable, as for conversion, to all having a right to property or possession in the goods. Fla. Stat. § 678.10 F.S.A; see also Wheelock Bros. v. Bankers Warehouse Co., 1946, 115 Colo. 197, 171 P.2d 405, 168 A.L.R. 939. However, the warehouseman here contends that he can't be liable to the ultimate consignee since he had no notice of the assignment. Ordinarily a warehouseman is not guilty of conversion when he receives goods from one having possession but not the true ownership thereof and redelivers them to the bailor or subject to his order before receiving notice of the rights of the true owner. See Fla. Stat. §§ 678.09, 678.10, F.S.A.; see also cases cited in 56 Am.Jur. Warehouses, § 239, p. 429. Therefore, Zero would be justified in delivering goods withoout permission of the true owner if it received authorization from the bailor, Coordinated. In this case it is apparent that there were material issues of fact to be resolved concerning whether or not permission was ever given and also concerning the normal procedure for authorizing release of the goods.
It remains to be determined whether the letter from Zero to Commercial could be interpreted, as a matter of law, as a release of Zero's liability for misdelivery of the goods involved.
The construction and effect to be accorded a release depends on its purpose, the terms in which it is stated, and the subject matter to which it applies. Bruce Const. Corporation v. Federal Realty Corp., 104 Fla. 93, 139 So. 209 (1932). In construing a release and determining the intent of the parties, the entire instrument, and not detached sections of it, is to be examined. See cases cited at 76 C.J.S. Release § 38, p. 670, note 92.
The language of the last paragraph of the letter from Zero to Commercial persuades us that a reasonable interpretation of the letter could be that Zero intended to qualify whatever was said in the preceding paragraphs. The letter stated that trailer 510 was not in the possession of Zero. There appears to be a material issue of fact concerning whether there was a meeting of the minds of the parties as to all the surrounding circumstances. See Jacksonville Terminal Company v. Misak, Fla. 1958, 102 So.2d 295, 298.
It is the settled law in this State that summary judgments should be granted only in those cases where there remains no genuine issue of any material fact that would properly fall to a jury. The intent of the parties can better be determined after a consideration of all the circumstances involved.
We hold that the letter lends itself to more than one reasonable interpretation, and it creates such ambiguity as would preclude the entry of a summary judgment. See Owens v. MacKenzie, Fla.App. 1958, 103 So.2d 677; King v. Sturge, Fla.App. 1959, 113 So.2d 257. When the wording of an agreement is ambiguous and the parties contend for different interpretations, the issue of the proper interpretation *113 becomes one of fact precluding the grant of summary judgment. Rock-Weld Corp. of P.R. v. Rock-Weld Equip. Corp., Fla. App. 1966, 184 So.2d 186.
Since we find material issues of fact concerning Zero's liability to Commercial and also concerning the alleged release, we must reverse the judgment of the lower court and remand for proceedings in accordance with this opinion.
Reversed and remanded.
NOTES
[1] It was decided in Commercial Trad. Co. v. Coordinated Carribean Tr., Fla.App. 1965, 178 So.2d 890, that the bill of lading involved was "straight" or non-negotiable.
[2] From the depositions it is apparent that there were two #510 trailers in Zero's warehouse. One trailer arrived two weeks after the arrival of the trailer with the goods in question. It also contained a shipment of beef. There is testimony in the depositions that the carrier gave proper authorization to Zero for the release of trailer #510 which is not the subject of this litigation.